365 A.2d 748.

ELEANOR D. PRESLEY *et al. vs.* NEWPORT HOSPITAL *et al.*

NOVEMBER 8, 1976.

PRESENT: Bevilacqua, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

PAOLINO, J. This is an appeal from a summary judgment entered in the Superior Court in the defendants' favor.

The facts, for present purposes, are not in dispute. On December 22, 1969, plaintiff Eleanor D. Presley, being pregnant, was admitted to the Newport Hospital for the purpose of inducing labor. The complaint alleges that defendant, Frank J. Logler, M.D., negligently prescribed drugs to induce labor and that he thereafter failed to properly supervise the inducement of labor. The principal al-

legation made by plaintiffs is that as a direct and proximate result of the described negligent conduct, Jane Doe Presley, a viable fetus, died on December 30, 1969, having been stillborn.

Eleanor D. Presley and Lewis G. Presley, individually and as surviving parents and sole beneficiaries of the said Jane Doe Presley, on November 17, 1971, brought suit under the Wrongful Death Act, G. L. 1956 (1969 Reenactment) §10-7-1 et seq. for the wrongful death of Jane Doe Presley, "a viable fetus, who died intestate, *en ventre sa mere.*" Named as defendants in the suit were Frank J. Logler, M.D., individually and as agent and servant of Aquidneck Medical Associates, Inc. and Newport Hospital. In the same three counts, plaintiff, Eleanor D. Presley, seeks damages for physical and emotional injury, and plaintiff, Lewis G. Presley, seeks consequential damages therefor.

Before the matter was brought to trial, plaintiffs filed a motion for partial summary judgment as to the common defense that plaintiffs had failed to state a claim upon which relief might have been granted. Each defendant responded by filing a cross-motion for summary judgment. These motions were heard by a justice of the Superior Court on the narrow issue of "whether or not the wrongful death of a fetus entitles its parents, as beneficiaries, to maintain the statutory action" for wrongful death. On June 26, 1974, he rendered a decision denying plaintiffs' motion and granting the motions filed by defendants. The complaint as to the claim for damages for wrongful death was denied and dismissed. Judgment was entered accordingly on July 3, 1974.

The sole question presented by this appeal is whether an action for wrongful death will lie where the decedent was a stillborn fetus. To state the issue more specifically, we must decide whether the parents of an unborn fetus,

180

as statutory beneficiaries, are entitled to damages for the wrongful death of that fetus where both the alleged negligently inflicted injury and the death of the fetus occurred before death.

The right to bring an action to recover damages for the death of another is conferred by statute. The Rhode Island Wrongful Death Act is patterned after the original Lord Campbell's Act which created a theretofore unrecognized remedy which had as its primary intent the compensation for the loss sustained by widows and children in the eventuality of the death of the family breadwinner. Thus, our statute, insofar as it tracks its English predecessor, is in derogation of the common law and as such only confers upon parties and courts such privileges and powers as may be consistent with a strict construction of the terms and language. *Carrigan* v. *Cole,* 35 R. I. 162, 165, 85 A. 934, 935 (1913). Consistent with this mandate we turn to the wording of our statute insofar as is relevant to the current proceedings. Section 10-7-1 provides:

> "Liability for damages for causing death. — Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who, or the corporation which, would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured * * *."

The statute, in essence, set forth three requirements for the existence of a right of action in wrongful death. 1) There must be a person who has died. 2) The person must have died of injuries resulting from a wrongful act, neglect or default that would have conferred a right of action upon the person who died, had that person survived. 3) The act, neglect or default that caused the fatal injury must

have been performed by another. The facts in the pleadings, if taken to be true, indicate that the second and third requisities for this action are indisputably present. Wrongful neglect is alleged and defendants are alleged to have committed that wrongful neglect. Thus, although the Superior Court justice's decision, in relying very generally upon a dissent to an Illinois case, *Chrisafogeorgis* v. *Brandenberg*, 55 Ill.2d 368, 304 N.E.2d 88 (1973), does not rest explicitly on the point, we must conclude that judgment was granted in defendants' favor on the basis of a finding that a stillborn fetus is not a "person" within the meaning of the statute, that is, that the first requirement of §10-7-1 was not satisfied.

Our task in this case can therefore be narrowed to a consideration of whether a strict construction of the language of §10-7-1 permits a reading of the word "person" to include a fetus which dies *en ventre sa mere*. This is a question of first impression in this jurisdiction.

The status of the unborn has long been an especially troublesome area of the law. In *Dietrich* v. *Inhabitants of Northampton*, 138 Mass. 14, 52 Am.R. 242 (1884), the Supreme Judicial Court, in an opinion written by Mr. Justice Holmes, denied recovery to an administrator who sued on behalf of a prematurely born child for injuries sustained while the child was a nonviable fetus *en ventre sa mere*. The court held that an unborn fetus has no judicial existence; that, until its birth, it is an integral part of its mother. Thus, no right of action could accrue to an unborn fetus. *Id.* at 17, 52 Am.R. at 245.

This view remained virtually unassailed and was widely subscribed to by courts in other jurisdictions for many years. *See, e. g., Gorman* v. *Budlong*, 23 R. I. 169, 49 A. 704 (1901). The first audible dissenting voice was that of Mr. Justice Boggs in his dissent to the opinion of the Supreme Court of Illinois in *Allaire* v. *St. Luke's Hosp.*, 184

Ill. 359, 56 N.E. 638 (1900) (Boggs, J., dissenting). It was his view that whenever a child *in utero* reaches the stage of viability, that is, that period in a child's fetal development when it becomes capable of independent life, and subsequently is born alive, "* * * such child has a right of action for any injuries wantonly or negligently inflicted upon his or her person at such age of viability, though then in the womb of the mother." *Id.* at 374, 56 N.E. at 642.

The first meaningful departure from the *Dietrich* position occurred in 1946 in the case of *Bonbrest* v. *Kotz,* 65 F.Supp. 138 (D.D.C. 1946). That case was an action brought by an infant to recover damages for prenatal injuries negligently inflicted by a physician in the course of delivery. The court branded Mr. Justice Holmes' view as being anomalous, especially in view of intervening scientific advances, and espoused the view " '* * * a child, if born alive and *viable* should be allowed to maintain an action in the courts for injuries wrongfully committed upon its person while in the womb of its mother.' " *Id.* at 142.

*Bonbrest* and its progeny set the conceptual stage for the decision 3 years later by the Supreme Court of Minnesota in *Verkennes* v. *Corniea,* 229 Minn. 365, 38 N. W.2d 838 (1949). That case involved the alleged negligent supervision of a childbirth which caused the mother to die of a ruptured uterus and caused her viable child to be stillborn. A wrongful death action was brought by the father for the death of the child and the defendant's demurrer to the action was sustained by the trial court. Citing Mr. Justice Boggs' dissent in *Allaire* and the court's opinion in *Bonbrest,* the Minnesota court reversed and held that under that state's wrongful death statute a right of action accrued in favor of a stillborn fetus that had attained the developmental stage of viability. The court stated that "[i]t seems too plain for argument that where

independent existence is possible and life is destroyed through a wrongful act a cause of action arises * * * ." *Verkennes* v. *Cornier, supra* at 370-71, 38 N.W.2d at 841.

Numerous jurisdictions, including our neighboring states of Connecticut, *Gorke* v. *Le Clerc,* 23 Conn. Supp. 256, 181 A.2d 448 (Super. Ct. 1962), and Massachusetts, *Mone* v. *Greyhound Lines, Inc.,* Mass.   , 331 N.E.2d 916 (1975), have participated in this retreat from Mr. Justice Holmes' original pronouncement. In fact, it has now become the majority view that where an unborn viable fetus suffers a negligently inflicted injury, the law should not permit a differentiation, for purposes of wrongful death, between the child who dies just before birth and the one who does shortly after birth. *See Chrisafogeorgis* v. *Brandenberg, supra at* 370-71, 304 N. E. 2d at 89-90; Annot., 15 A.L.R.3d 992, 995-99 (1967). In attaining this result, many courts rely on the proposition, attributed to the civil law, that from the moment of conception a separate organism with its own identity comes into existence. *See, e.g., Bennett* v. *Hymers,* 101 N. H. 483, 485, 147 A.2d 108, 110 (1958). Other authorities cite the corresponding medical proposition, that an ovum, once it is fertilized, is a separate living entity. *See, e.g., Note,* 39 Cornell L.Q. 542, 545-46 (1954); *Bonbrest* v. *Kotz, supra* at 140-41 & n.13. Still other authorities attribute identities to the unborn by analogy to other fields of law.[1] In this regard it has been

---

[1]Those who rest on this comparison to other fields of the law enjoy the concurrence of perhaps the most revered commentator on the common law, Sir William Blackstone, who recorded the following passage:

"An infant *in ventre sa mere,* or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born. And in this point the civil law agrees with ours." 1 Blackstone, *Commentaries on the Laws of England* at 130 (Cooley ed. 1872).

queried concerning the status of a viable fetus:

> "Why a 'part' of the mother under the law of negligence and a separate entity and person in that of property and crime?
>
> "Why a human being, under the civil law, and a nonentity under the Common Law?" *Bonbrest* v. *Kotz, supra* at 140-41.

Several courts have cited logic as their strongest ally, warning of the incongruities that could result if we were to adhere to the requirements that a child be born alive to recover for prenatal injuries. They point out that the arbitrariness of birth as a demarcation line and the absurdity of permitting recovery except where the tortfeasor is so "fortunate" as to inflict an injury sufficiently severe to cause death before birth. *Todd* v. *Sandidge Constr. Co.,* 341 F.2d 75, 76-77 (4th Cir. 1964); *Stidam* v. *Ashmore,* 109 Ohio App. 431, 434, 167 N.E.2d 106, 108 (1959).

Though differing reasons have been enlisted to buttress the result that the tortious killing of the unborn is a compensable wrong, there is one common thread that runs through all the authorities hereinbefore cited. That is, the courts, almost without exception,[2] have specified that to recover under the wrongful death statutes a fetus shall have been viable at the time the injury was inflicted. *See, e.g., Panagopoulous* v. *Martin,* 295 F.Supp. 220, 226 (S.D.W.Va. 1969); *Gorke* v. *Le Clerc, supra* at 262, 181 A.2d at 451; *Chrisafogeorgis* v. *Brandenberg, supra* at 374-75, 304 N.E.2d at 92.

Reliance on the viability distinction has been spurned in

---

[2]The only jurisdiction ruling on the availability of wrongful death relief for the killing of the unborn that has not imposed a viability requirement is Georgia. Cases decided by that state's highest courts indicate that the right of action for prenatal injuries becomes available at that point in time when the fetus becomes quick or capable of moving in the mother's womb. *Porter* v. *Lassiter,* 91 Ga. App. 712, 715, 87 S.E.2d 100, 102 (1955).

several cases concerning prenatal injuries to individuals who survive birth and are forced to carry the scars of their early injuries through life. A recent line of cases has cast the viability distinction aside as an anomaly owing its existence to long outmoded concepts of both science and the law. One of the more recent pronouncements in this line was the decision of this court in *Sylvia* v. *Gobeille,* 101 R. I. 76, 220 A.2d 222 (1966), wherein we held that we were unable logically to conclude that a claim for an injury inflicted prior to viability is any less meritorious than for one sustained after. We stated, in the context of a case brought on behalf of a person who survived birth and was suing for injuries incurred while a nonviable fetus, that no sound reason exists for drawing a line at the precise moment of the fetal development when the child attains the capability of an independent existence. We explicitly rejected viability as a criterion, substituting in its place reliable proof of causation. The plaintiff's burden is to satisfactorily demonstrate that the damage sustained is traceable to the wrongful act of another. *Id.* at 79, 220 A.2d at 224. *Accord, Bennett* v. *Hymers, supra; Smith* v. *Brennan,* 31 N.J. 353, 157 A.2d 497 (1960); *Sinkler* v. *Kneale,* 401 Pa. 267, 164 A.2d 93 (1960). In *Sylvia* this court also expressly declined, however, to respond to the question raised in the present appeal, to wit, whether a child must be born alive in order to maintain an action for injuries sustained while *en ventre sa mere. Sylvia* v. *Gobeille, supra* at 80, 220 A.2d at 224.

Our brief survey of the law has revealed two propositions, one which represents the weight of authority and one which, though perhaps not the weight of authority, is the law of this jurisdiction. The first proposition is that the wrongful injury of a fetus resulting in its still-birth is a compensable wrong under the wrongful death acts if the injury which caused the death was inflicted

at some time after the fetus attained the developmental stage of viability. The second is that one who survives birth may recover damages from a wrongdoer who inflicts prenatal injury regardless of the state of fetal development at which the injury occurs if the injured party can come forth with reliable proof of a causal link between the tortious act and the injury. In their brief, plaintiffs in the instant case, urge adoption of the majority rule, the first proposition stated above, in order to preserve what they perceive to be the scope of their right of action under the Wrongful Death Act. Their primary contention is that our holding in *Sylvia* should lead us to concur with the decisions that have obtained in the majority of our sister jurisdictions considering the question. They cite as authority for this leap from one proposition to the next a supposed parallel evolution of the law in the state of Maryland. That state's Supreme Court, in *State ex rel. Odham* v. *Sherman,* 234 Md. 179, 198 A.2d 71 (1964), relied upon its own previous decision in *Damasiewicz* v. *Gorsuch,* 197 Md. 417, 79 A.2d 550 (1951), a case analogous to *Sylvia,* to grant the same relief sought here. However, while *Damasiewicz,* like *Sylvia,* granted relief in a negligence action for prenatal injuries, it is distinguishable from *Sylvia* in that in the former case the injury occurred after the fetus had attained viability and it seems, from the authority cited by the Maryland court, that the fact of viability was considered by it to be essential to recovery. Thus, while the *Sherman* holding that a wrongful death action accrues to a stillborn where the injury occurred after the fetus became viable follows logically from the *Damasiewicz* decision, we cannot, in the present case, reach the *Sherman* result by tracing that same logical progression. That is, because *Sylvia* rejected viability as a criterion for recovery for prenatal injuries, it cannot now be referred to as direct authority for plaintiffs' posi-

tion that an action lies in their favor for the wrongful death of a stillborn viable fetus. If we are to find that a cause of action exists here, and if we are to do so consistently with our opinion in *Sylvia,* we must pursue that result by a different route than the one suggested by plaintiffs.

Initially, we find to be persuasive most of the arguments put forth by plaintiffs to the effect that death before birth is an arbitrary criterion by which to deprive a right of action. Indeed, if prenatal injury is wrongfully inflicted there is no perceptible reason why there should be a legally recognized difference between a death that occurs immediately before birth and one that occurs immediately after. *Stidam* v. *Ashmore, supra* at 434, 167 N.E.2d at 108. Likewise, it makes poor sense to sanction a legal doctrine that enables the tortfeasor whose deed brings about a stillbirth to escape liability but that renders one whose wrongdoing is less severe answerable in a wrongful death or other negligence action merely because his victim survives birth. *Todd* v. *Sandidge Constr. Co., supra* at 76-77. Of all the arguments in plaintiffs' favor, the most simple and perhaps the one that underlies all others is that it is simply illogical and therefore arbitrary to cut off the right of action at birth. The myth, perpetuated by Mr. Justice Holmes in 1884, that the unborn fetus is but a part of its mother's body, has long since been laid to rest in both the law and medicine.

While we subscribe to the view of the above-mentioned authorities regarding liability of the tortfeasor in a case like this one, we must, consistently with our previous decision in *Sylvia,* diverge from their view of the significance of viability. In *Sylvia,* we were unable logically to conclude that a claim for any injury inflicted prior to viability is any less meritorious than one sustained after. Similarly, in the present instance, logic does not permit the insistence

on viability as the line of demarcation between those for whom an action will lie and those who are without rights under the statute.

Simple precepts of logic have carried this small area of the law to a point far removed from the position adopted by Mr. Justice Holmes in *Dietrich* v. *Northampton, supra.* The momentum of that logic together with our previous holding in *Sylvia* carry us now to the inescapable conclusion that viability is a concept bearing no relation to the attempts of the law to provide remedies for civil wrongs. If we profess allegiance to reason, it would be seditious to adopt so arbitrary and uncertain a concept as viability as a dividing line between those persons who shall enjoy the protection of our remedial laws and those who shall become, for most intents and purposes, nonentities. It seems that if live birth is to be characterized, as it so frequently has been, as an arbitrary line of demarcation, then viability, when enlisted to serve that same purpose, is a veritable *non sequitur.*

We are cognizant of the fact that the present case does not squarely call into question the impact of viability in a suit for the wrongful death of a stillborn, in that the pleadings, taken to be true for purposes of the motion for summary judgment, admit that at the times of the alleged wrongful neglect and stillbirth, Jane Doe Presley was viable. However, as our holding in this case indicates, the decedent, whether viable or nonviable, was a "person" within the meaning of the Wrongful Death Act. That is to say, our election to rely on the precedent of *Sylvia* v. *Gobeille, supra,* does not permit even the assumption *arguendo* that the decedent was viable at all times relevant. It would be palpably illogical to discredit viability in one context only to rehabilitate it, even for the sake of argument, in another, integrally related context. Therefore, for the present purpose of deciding whether these beneficiaries have a right

of action under the statute, we will disregard the allegation of viability.

We are cognizant also that this holding will precipitate criticism to the effect that we have opened the door to highly speculative if not totally meritless claims for relief. The Supreme Court of New Jersey in a case similar to *Sylvia* v. *Gobeille, supra,* answered this challenge by saying that "* * * these difficulties * * * are not peculiar to the field of prenatal torts. They exist in many kinds of cases. Moreover, the present case is here on a motion which concedes the pleaded fact of causation. In any event, the mere difficulty of proving a fact is not a very good reason for blocking all attempts to prove it." *Smith* v. *Brennan,* 31 N.J. 353, 365, 157 A.2d 497, 503 (1960). In this context, we reiterate our holding in *Sylvia* v. *Gobeille, supra,* that the legal right of a child "to begin life with a sound mind and body" should not be abridged by difficulties in proof of causation. *Id.* at 79, 220 A.2d at 224, *quoting, Smith* v. *Brennan, supra* at 364, 157 A.2d at 503. Recovery for prenatal injuries, like any injuries, whether they result in death, disability or temporary discomfort, is subject to the plaintiff's meeting his burden of establishing "*'by competent proof* that there is a causal connection between the wrongful interference and the harm suffered.'*" Sylvia* v. *Gobeille, supra* at 79, 220 A.2d at 224, *quoting, Smith* v. *Brennan, supra* at 364, 157 A.2d at 503. *Accord, Mone* v. *Greyhound Lines, Inc.,* Mass. , , 331 N.E.2d 916, 919 (1975).

We conclude, therefore, that, within the meaning of the Wrongful Death Act, G.L. 1956 (1969 Reenactment) §10-7-1 et seq., the plaintiffs' decedent, Jane Doe Presley, was a person. Thus, an action may be brought to determine the merits of the plaintiffs' claim that the defendants, through their alleged wrongful neglect, are liable for the wrongful death of the said Jane Doe Presley.

For the reasons stated herein, the plaintiffs' appeal from the summary judgment entered in the Superior Court is sustained. The judgment is vacated and the case is remitted to the Superior Court for further proceedings.

Mr. Chief Justice Bevilacqua, concurring in part and dissenting in part. Based on the pertinent facts controlling in this case I concur only in the result my Brother Paolino reaches. An action for wrongful death should lie where the decedent was a stillborn viable fetus regardless of when the injury occurred. Nonetheless, I am not persuaded that either logic or law compels us to conclude in some future case that such an action may be brought where the decedent, a nonviable fetus, was stillborn. That issue was expressly left unanswered in *Sylvia* v. *Gobeille*, 101 R.I. 76, 80, 220 A.2d 222, 224 (1966), where we held that a *common law* action accrued to a child who survived birth for prenatal injuries caused by the negligent act of another. In so concluding we found that it was of no moment whether the injury occurred prior to or after viability. Both the rationale and the result in *Sylvia* are eminently laudable: a person surviving birth, stigmatized with scars of the tortious conduct of another should not be denied remedial relief simply because prenatal injury preceded viability. Clearly, in such a case there can be no question that a duty is owed to refrain from tortious conduct which results in injury to another. Nor should this duty be abrogated where injury is to a viable fetus capable of independent existence apart from its mother. *See Allaire* v. *St. Luke's Hosp.*, 184 Ill. 359, 368, 56 N.E. 638, 641 (1900) (Boggs, J., dissenting).

Unlike *Sylvia*, however, the case before us is a statutory action for wrongful death and interests which compel a right to remedial relief in a common law action by an aggrieved party are, in at least some respects, dissimilar from interests which underlie a statutory grant of relief

under a wrongful death action. Significantly, a common law action is intended to vindicate a victim's interest in remaining free from tortious injury. Our wrongful death statute, however, was enacted primarily to benefit the statutory beneficiaries of the deceased. General Laws 1956 (1969 Reenactment) §10-7-2. This distinction impliedly manifests the difficult question lurking behind the issue of viability: whether a separate duty of conduct is owed to a nonviable fetus. While a liberal reading of the language expressed by my Brother Paolino would necessitate an affirmative answer to this question, with all due respect, the reasoning utilized does not adequately address the interests which would compel us to reach such a novel conclusion.[1]

Concerning my Brother Kelleher's analysis, *infra,* I also find myself in disagreement. His reasoning in significant part rests upon the unassailable foundation that a legislature's intent in promulgating a statute controls in determining its subsequent construction. Nonetheless, the manner of its application by my Brother Kelleher to the facts in this case — that the General Assembly did not intend a stillborn viable fetus to be a person within the context of our wrongful death statute — cannot be harmonized with that principle.

Intent is usually most clearly manifest in the express language contained in the statute itself. Where, however, that language is susceptible to a number of reasonable and different meanings, it is clear that express language alone may not be dispositive. Mr. Justice Cardozo, with customary insight, candidly recognized that the judiciary, while

---

[1] The only published opinion which would appear to disregard viability as a determinative factor in allowing recovery by a stillborn fetus is *Porter* v. *Lassiter,* 91 Ga. App. 712, 87 S.E.2d 100 (1955). The decision, however, apparently rested upon the fact that the fetus was capable of moving in its mother's womb.

it must follow the mandate pronounced by the legislature, bears the responsibility of insuring that doubts and ambiguities, if they exist in a statute, are fairly resolved. Cardozo, *The Nature of the Judicial Process* 14-16 (1921). In such a case, other factors, most notably that of effectuating the dominant purpose of the statute, should guide us in determining its applicability. *See Endresz* v. *Friedberg,* 24 N.Y.2d 478, 490-91, 301 N.Y.S.2d 65, 74-75, 248 N.E.2d 901, 907-08 (1969) (Burke, J., dissenting in part).

This case presents for judicial construction the meaning of the word "person" as it is used in our wrongful death statute. Arguably, that word is applicable in at least three distinguishable circumstances: where the fetus has survived birth, where the fetus is viable, and where the fetus is non-viable. It is not, however, defined in our wrongful death statute. My Brother Kelleher's conclusions as to its supposed accepted meaning at the time of the statute's promulgation are unsupported. On the contrary, the point at which a sovereign should intercede through its laws to protect human life as well as afford remedial relief has long been the subject of scrutiny. *See Roe* v. *Wade,* 410 U.S. 113, 130-47, 93 S.Ct. 705, 715-24, 35 L.Ed.2d 147, 164-74 (1973). Beginning at least in Greek and Roman law and continuing in varying degrees to our own common law as received from its English predecessor, viability, and not exclusively birth, has been a contributing factor in determining when the law recognized the existence of a person. *Id. See e.g., Allaire* v. *St. Luke's Hosp.*, 184 Ill. 359, 370-72, 56 N.E. 638, 640-41 (1900) (Boggs, J., dissenting). Indeed, the Supreme Court's decision in *Roe* recognized that a state has such a compelling interest in the protection of fetal life after viability that it may proscribe nontherapeutic abortions during that period. *Roe* v. *Wade, supra* at 163-64, 93 S.Ct. at 732-33, 35 L.Ed.2d at 182-83. This cursory historical examination inferentially points to the

potential uncertainty the use of the word "person" had even at the time our wrongful death statute was passed in 1853. In light of this, I believe it is incumbent upon this court to interpret our wrongful death statute in harmony with the dominant purpose of the legislation. And where the facts presented bear an appropriate relation to that purpose, as they do here, we should not be constrained by a narrow reading of the language of that statute.

In conclusion, therefore, I do not believe a reasonable interpretation of our wrongful death statute precludes us today from holding that an action will lie where the decedent was a stillborn viable fetus.

Mr. Justice Kelleher, dissenting. My Brother Paolino explicates with his accustomed excellence those considerations which prompt him to favor the allowance of an action for wrongful death when a child is stillborn as a result of prenatal injury. I cannot fault his rhetoric. His reference to the advances made in the various sciences is indisputable. However, at no point does he address himself to the single simple and decisive issue presented by this appeal, which is: Did the General Assembly intend that a stillborn fetus was to be considered as a "person" within the context of our wrongful death statute so that the plaintiffs could maintain this present action?

The answer is "No," and my negative response is in no way dependent upon whether a fetus is a person in the philosophical, theological, or scientific sense, nor is my belief based upon the Supreme Court's recent pronouncements in the area of abortion.[1] While it is true that we have made great strides in the field of the sciences and we

---

[1] In *Roe* v. *Wade*, 410 U. S. 113, 158, 93 S.Ct. 705, 729, 35 L.Ed.2d 147, 180 (1973), Mr. Justice Blackmun, in writing for the majority, declared that the word "'person', as used in the Fourteenth Amendment does not include the unborn." The opinion points out that in nearly all instances where the word "person" is found in the Federal Constitution, the word

have read with great respect the writings of learned philosophers and theologians, we should remember that such individuals cannot create a right of action at law, for this is the job of the Legislature.

Prior to 1846 no recovery could be had for an injury resulting in death. The action died with the person, and neither creditors nor heirs had any enforceable right, however great their loss might have been because of the death. In 1846 Parliament adopted Lord Campbell's Act, which was entitled "An act for compensating the families of persons killed by accident." That Act was enacted for the benefit of the family and not the decedent's estate. It gave the family a new remedy for death where before no such remedy had existed. In 1847 New York became the first state of the United States to embrace the general features of Parliament's pioneer legislation, and Rhode Island followed suit in October 1853.

Lord Campbell's Act, as well as our statute, being in derogation of the common law, confer upon the litigants and the courts only such powers and privileges as are consistent with a strict construction of the terms and the language employed. *Walsh* v. *Bressette,* 51 R.I. 354, 155 A. 1 (1931); *Carrigan* v. *Cole,* 35 R.I. 162, 85 A. 934 (1913).

Through the years this court has ruled that the remedies provided by the Wrongful Death Act were available only if the injured party could have maintained suit for damages if his death had not ensued. *Castellucci* v. *Castellucci,* 96 R.I. 34, 188 A.2d 467 (1963); *Gorman* v. *Budlong,* 23 R.I. 169, 49 A. 704 (1901); *Miller* v. *Coffin,* 19 R.I. 164, 36 A. 6 (1895); *Neilson* v. *Brown,* 13 R.I. 651 (1882). To-

---

is being applied in a postnatal rather than a prenatal sense. A provocative outlook as to the possible effect of the *Roe* case on the fetus' legal status in other areas of the law may be found in Comment, *Wrongful Death and the Unborn: An Examination of Recovery after Roe* v. *Wade,* 13 Journal of Family Law 99 (1973-74).

day our Wrongful Death Act, G.L. 1956 (1969 Reenactment) ch. 7 of title 10, affords two separate causes of action. One is a recovery for death (§10-7-1), and the other is for "* * * hospital, medical and other expenses incurred, including diminution of earning power until time of death, by or in behalf of the party injured by reason of such wrongful act, neglect or default * * *" (§10-7-5) plus pain and suffering (§10-7-7). The death action is to be brought by the executor or administrator of the deceased person, and the recovery is divided among the husband, widow, and children, but if there be no children, the award goes to the surviving husband or widow, and in the event there be no husband, widow, or children, the next of kin shall share the award in the same proportions as the intestacy law provides for the distribution of personal property. However, if no action is instituted by the fiduciary within 6 months after the death, the action may be instituted by any of the beneficiaries (§10-7-3). Any award given in the death action is not considered as an asset of the estate but is distributed directly to the beneficiaries designated in the statute. *Walsh* v. *Bressette, supra; see also* §10-7-10.

This court has held that a claim for pain and suffering, medical expenses, and diminution of earning power is an independent cause of action which calls for a separate judgment. *O'Leary* v. *Bingham,* 90 R.I. 441, 159 A.2d 619 (1960). It must be recovered in a separate civil action brought by the executor or administrator, and the amount recovered is part of the decedent's estate (§10-7-6).

In resolving the issue presented by this controversy, our function here is no different than when we are faced with the task of construing any law to ascertain the legislative intent. In this case we must assume that the General Assembly, when it created a right of action for the "death of a person * * * caused by the wrongful act, neglect, or

default of another," (§10-7-1) intended to give the phrase "death of a person" its ordinary, plain meaning and sense in the context within which it is used. *Potowomut Golf Club, Inc.* v. *Norberg,* 114 R.I. 589, 337 A.2d 226 (1975). After all, "death of a person" is a term of common parlance and must, therefore, be accorded its usual, commonly understood meaning. *Lally* v. *Automobile Mut. Ins. Co.,* 114 R.I. 582, 337 A.2d 243 (1975).

Our Wrongful Death Act is liberally sprinkled with terms such as "executor or administrator of such deceased person," "husband or widow," "children of the deceased," "next of kin," "diminution of earning power until time of death," and "decedent's estate." For those willing to read the statute in its entirety, the presence of those terms is a clear, positive indication that the General Assembly never intended to create a cause of action for the death of the unborn fetus. The General Assembly by its inclusion of these phrases made it clear that it was creating causes of action only where the death was of a living human being who by birth had acquired a recognized identity — a person as that term is commonly understood. In common understanding a person, in order to be deceased, must first have to be born alive.

As noted before, the right to bring a wrongful death action is conditioned upon the "death of a person" who, if he or she survived, could have instituted an action for damages. Assuming a prenatal injury and a month or so later a stillbirth which is totally unrelated to the previous injury, would the average person consider the fetus during this interval between injury and death as a person? The question, I believe, is rhetorical. Nevertheless, if the fetus is a person, the personal injury action would still be maintainable under our survival statute. Causes of action for "damages to the person" may be brought by "executors and administrators." Sections 9-1-6 and 9-1-7. In *Lubrano*

v. *Atlantic Mills*, 19 R.I. 129, 32 A. 205 (1895), the court said that our survival statute, which preserves a suit for "damages to the person," relates only to injuries that do not result in death, whereas the remedy for death was given in substitution for the right of action which the person injured would have had if he had survived, the basis of each action being the negligence of the wrongdoer.

Having had my say as to the legislative intent when the General Assembly first furnished a remedy for wrongful death in the mid-nineteenth century and the several times it has acted in this area during the ensuing years, I would offer a few respectful but pertinent comments as to some of the observations made by the distinguished Senior Associate Justice of this court.

The argument that since a child *in utero* is considered in being or alive for the purpose of taking property and, to some extent, protected by the criminal laws, such a child should likewise be so regarded and treated even when stillborn is fallacious. Such principles are solely for the protection of the child and not for the benefit of those who take through the child. *Endresz* v. *Friedberg*, 24 N.Y.2d 478, 248 N.E.2d 901, 301 N.Y.S.2d 65 (1969). Even though the unborn has certain rights under the property law, it is universally recognized that its enjoyment of those rights is contingent *upon its being born alive*. 4 Tiffany, *The Law of Real Property* §1127 at 675 (3d ed. 1975).

There are those who claim that it is arbitrary and illogical to draw the line at birth with the result that the distributees of an injured fetus who survives birth by perhaps a few minutes may have recovery, while those of a stillborn fetus may not. However, such difficulties are always present whenever a line must be drawn. The line in this case has been drawn by the Legislature, and it is that body that is charged with the responsibility of moving the line.

In a comprehensive, scholarly review of all the legal

rights arising from the tortious injury to the unborn fetus, David A. Gordon in *The Unborn Plaintiff*, 63 Mich. L. Rev. 579 (1965), responds to those who think that the relevancy of birth is "arbitrary," "unjust," "illogical," and "intolerable" and would dismiss birth as having no significance. Gordon points out that if logic is the order of the day, then "* * * it is illogical for majority to begin at twenty-one years of age or that an infant is irrebuttably incapable of criminal intention on a Thursday but not on a Friday. Law requires some definitive clear-cut lines, particularly one which heralds the beginning of legal personality. It is inaccurate to characterize the law of status as arbitrary, if that word is ever to have any meaningful content." *Id.* at 593.

The case most often relied upon by jurisdictions that permit a prenatal wrongful death recovery is *Verkennes* v. *Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949). There the court based its holding on Mr. Justice Boggs' dissent in *Allaire* v. *St. Luke's Hosp.*, 184 Ill. 359, 56 N.E. 638 (1900); *Bonbrest* v. *Kotz*, 65 F.Supp. 138 (D.D.C. 1946); and the Canadian case, *Montreal Tramways* v. *Leveille*, 4 Dom.L.R. 337 (1933). None of these cases support the sweeping view taken by the Minnesota court because in each case specific reference was made to the fact that the infant was born alive. This oversight points out that in their desire to disassociate themselves from the harsh rule of *Dietrich* v. *Inhabitants of Northampton*, 138 Mass. 14, 52 Am.R. 242 (1884), many courts tend to equate prenatal death with prenatal injury.[2] Comment, *Development in the Law of Prenatal Wrongful Death*, 69 Dick. L. Rev. 258,

---

[2] In *Sylvia* v. *Gobeille*, 101 R. I. 76, 220 A.2d 222 (1966), we retreated from the *Dietrich* rule and held that *a child born alive* had a right of action against the negligent wrongdoer for its prenatal injury. Nothing we said in *Sylvia* can serve as a springboard so that one can equate a fetus with the "person" referred to in our Wrongful Death Act.

259. Gordon maintains that the Minnesota ruling has created a legal schizophrenia because it has created a tort rule that, when applied to a child *in utero,* differs from the property rule. He has suggested that this split personality view of the law can be cured "by future courts ignoring *Verkennes* v. *Corniea."*

Nor does the Chief Justice in his concurrence shed any light on the crucial issue before us, and his decision to preserve viability as a line of demarcation simply compounds the problem. That two members of this court would extend the statutory term "person" to the point of conception, while a third would go only to the point of viability illustrates the problems inherent in judicial redefining of the Legislature's mandate.

The Chief Justice, in eschewing a narrow reading of our wrongful death statute, refers to Mr. Justice Cardozo's observations on the duty of judges to clarify interstitial ambiguities. However, as Mr. Justice Cardozo also wisely noted, frequently the law is so clear that judges have no discretion, there being no gaps to fill. Cardozo, *The Nature of the Judicial Process* 129 (1921). Legislating between the gaps is reserved for instances where the legislative intent is cloaked in obscurity. *Town of North Kingstown* v. *Teachers Ass'n,* 110 R.I. 698, 706, 297 A.2d 342, 346 (1972). Here the legislative purpose in enacting our Wrongful Death Act is crystal clear.

The logical extension of today's plurality holding presents several ramifications of far-reaching dimensions. How about the physician who delivers a stillborn and the disappointed parent charges the physician with gross negligence? Taking the plurality's position to a logical conclusion, the physician should be subject to prosecution for involuntary manslaughter. *See generally State* v. *McVay,* 47 R.I. 292, 132 A. 436 (1926). Or what is to be the fate of the motorist who strikes a pregnant woman and a mis-

carriage ensues? Our vehicular homicide statute provides that when the "death of any person" is the proximate result of the operation of a motor vehicle in a "reckless disregard of the safety of others," the motorist shall be imprisoned for not more than 3 years. General Laws 1956 (1968 Reenactment) §31-27-1. An Ohio court faced with a similar statute and an identical fact pattern held that the conviction was improper because a viable fetus was not a person within the ambit of the statute. The court reasoned that an unborn fetus was not the subject of homicide at common law and, accordingly, could not be the subject of homicide under the statute. *State* v. *Dickinson,* 23 Ohio App.2d 259, 52 Ohio Op.2d 414, 263 N.E.2d 253 (1970); *see Keeler* v. *Superior Court,* 2 Cal.3d 619, 470 P.2d 617, 87 Cal.Rptr. 481 (1970). However, the result[7] reached today by the Chief Justice and my Brothers Paolino and Doris would seemingly mandate conviction both of the physician and the motorist in the circumstances presented.

The remedy, if any, for the problem presented by this appeal should be furnished by the legislative rather than the judicial branch of our State government.[3] The Legislature has, during its just recently concluded January 1976 session, demonstrated that it is aware of the unborn and its rights. On June 1, 1976, the Governor approved an act

---

[3]A listing of those jurisdictions that allow or do not allow recovery for the death of a stillborn is found in 15 A.L.R.3d 992 (1967). Among those jurisdictions denying recovery are California, *Norman* v. *Murphy,* 124 Cal.App.2d 95, 268 P.2d 178 (1954); Iowa, *McKillip* v. *Zimmerman,* 191 N.W.2d 706 (Iowa 1971); Nebraska, *Drabbels* v. *Skelly Oil Co.,* 155 Neb. 17, 50 N.W.2d 229 (1951); New Jersey, *Graf* v. *Taggert,* 43 N.J. 303, 204 A.2d 140 (1964); New York, *Endresz* v. *Friedberg,* 24 N.Y.2d 478, 248 N.E.2d 901, 301 N.Y.S.2d 65 (1969); North Carolina, *Gay* v. *Thompson,* 266 N.C. 394, 146 S.E.2d 425 (1966); Oklahoma, *Padillow* v. *Elrod,* 424 P.2d 16 (Okla. 1967); Pennsylvania, *Marko* v. *Philadelphia Transp. Co.,* 420 Pa. 124, 216 A.2d 502 (1966); Tennessee, *Durrett* v. *Owens,* 212 Tenn., 614, 371 S.W.2d 433 (1963); Virginia, *Lawrence* v. *Craven Tire Co.,* 210 Va. 138, 169 S.E.2d 440 (1969).

in which the Legislature amended the dependency benefits section of the Workmen's Compensation Act. The amendment defines a dependent child as including "* * * any child of the injured employee conceived but not born at the time of the employee's injury," and it directs that "compensation herein provided for shall be payable on account of any such child from the date of its birth." Public Laws 1976, ch. 199. The Legislature has drawn the line in this area at the date of birth. In conclusion, I would stress that the Wrongful Death Act was originally conceived in and by the Legislature. If its progeny is to be increased so as to include the unborn, the necessary conception and delivery should take place in the statehouse, not the courthouse.

I must, therefore, for all of the foregoing reasons, dissent from the views propounded by the Chief Justice and my Brother Paolino.

Mr. Justice Joslin, dissenting. I agree with my Brother Kelleher's dissent, but write separately in order to register an additional reason for dissenting from the plurality's and the Chief Justice's construction of our wrongful death statute. They construe the word "person" in the phrase "death of a person" in G.L. 1956 (1969 Reenactment) §10-7-1 to include a fetus, and premised thereon conclude that an action for the recovery of damages for negligently or wrongfully inflicted prenatal injuries may be maintained even if the injured fetus expires while *en ventre sa mere.*

An equally important consideration in my judgment, but one that receives only cursory attention from them, is the meaning of §10-7-1's requirement[1] which conditions

---

[1] General Laws 1956 (1969 Reenactment) §10-7-1 reads in pertinent part as follows:

"Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is

the right to maintain an action for prenatal injuries resulting in death upon whether the injured person, if born alive, could have maintained an action for those injuries. In deciding whether the stillborn infant could have maintained such an action, the controlling case law is not that first enunciated in 1946 in *Bonbrest* v. *Kotz,* 65 F. Supp. 138 (D.D.C.), and recently adopted by us in *Sylvia* v. *Gobeille,* 101 R.I. 76, 220 A.2d 222 (1966), but rather that prevailing in 1896, when our wrongful death statute was first codified in substantially its present form.[2] *Nolan* v. *Representative Council,* 73 R.I. 498, 504, 57 A.2d 730, 733 (1948); *see State* v. *Welch,* 117 R.I. 107, 363 A.2d 356 (1976). And at that time, as stated by the Massachusetts Supreme Judicial Court speaking through Mr. Justice Holmes, "* * * no case * * * ha[d] ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its mother's womb." *Dietrich* v. *Inhabitants of Northampton,* 138 Mass. 14, 15 (1884); *Gorman* v. *Budlong,* 23 R.I. 169, 49 A. 704 (1901). Under the wrongful death statute, that inability of a surviving infant to recover damages for prenatal injuries necessarily carries over and protects a wrongdoer from liability for the death of a stillborn infant.

---

such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who, or the corporation which, would have been liable if death had not ensued shall be liable to an action for damages * * *."

[2] General Laws 1896, ch. 233, §14 provides in pertinent part:

"Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony."

I am, of course, aware of the inconsistency between this result, which denies recovery for prenatal injuries sustained by a stillborn infant, and *Sylvia* v. *Gobeille, supra,* which permits such recovery if the infant survives birth by but a few moments. Actions for wrongful death, however, are nonexistent apart from statute, and hence the correction of that inconsistency is within the exclusive province of legislation and not of judicial decision. *Gorman* v. *Budlong, supra* at 177, 49 A. at 707.

*Alan T. Dworkin, Thomas H. Quinn, Jr.,* for plaintiffs.

*Hanson, Curran, Bowen & Parks, Kirk Hanson, David P. Whitman,* for Newport Hospital; *Hinckley, Allen, Salisbury & Parsons, Robert W. Lovegreen* for Frank J. Logler and Aquidneck Medical Associates, Inc., for defendants.